# In the United States Court of Federal Claims

No. 15-1532C
(Filed: November 21, 2016)

```
*************************************
FINANCIAL & REALTY SERVICES,     *
LLC,                             *
                                 *
               Plaintiff,        *
                                 *   RCFC 12(b)(6); RCFC 10(c); Breach of
v.                               *   Contract; Duty; Damages; Firm-Fixed-
                                 *   Price Task Order; Contract Interpretation
                                 *
THE UNITED STATES,               *
                                 *
               Defendant.        *
*************************************
```

Eden Brown Gaines, White Plains, MD, for plaintiff.

Anthony F. Schiavetti, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

In this case, plaintiff Financial & Realty Services, LLC ("FRS") claims it is entitled to payments pursuant to a firm-fixed-price task order with the General Services Administration ("GSA") of the United States government. Defendant United States moves to dismiss FRS's complaint for failure to state a claim upon which this court can grant relief. For the reasons set forth below, the court denies in part and grants in part the motion to dismiss.

**I. BACKGROUND**

FRS was awarded a firm-fixed-price task order (GS-P-07-13-UD-0028) on September 10, 2013, to provide project management services to the GSA in support of the GSA's repairs and alterations program at its New Orleans field office.[1] Compl. 1; Compl. Ex. 3-5. The task order was awarded to FRS under its GSA schedule contract (GS-00F-0056M).[2] Compl. 1; Compl. Ex.

---

[1] The court derives the facts in this section from plaintiff's complaint ("Compl.") and the exhibit attached to the complaint ("Compl. Ex."). References to averments set forth in the complaint are to page numbers since the paragraphs of the complaint are not numbered.

[2] The GSA schedule contract (GS-00F-0056M) that governs the task order at issue is not included in the record before the court.

3-5.  It included two firm-fixed-price line items for the base year, and a single firm-fixed-price line item for each of the three option years.  Specifically, the base year included a line item for project management services—$8,809.60 per month for twelve months, totaling $105,715.20— and a line item for a $12,000 travel allowance.  Compl. Ex. 4.  The start date of the task order was October 1, 2013, and the completion date was September 30, 2014.  Id. at 3.  The task order also set forth a delivery date of September 30, 2014, and a period of performance of July 29, 2013, to July 28, 2014.[3]  Id. at 4.  Similarly, each of the option years listed a line item for the project management services.  Id. at 4-5.  The first option year was priced at $8,809.60 per month for twelve months (October 1, 2014, to September 30, 2015), the second option year was priced at $8,987.20 per month for twelve months (October 1, 2015, to September 30, 2016), and the third option year was priced at $8,987.20 per month for twelve months (October 1, 2016, to September 30, 2017).  Id.  The total evaluated price for the services was $427,123.20 for the base year and three option years.[4]  Id. at 2, 4-5.

The task order was governed by a Performance Work Statement ("PWS") that outlined the responsibilities of both FRS and the GSA.  Id. at 6-21.  Under the PWS, FRS was responsible for "providing qualified personnel" who had to be approved by the GSA.  Id. at 6.  Sections 1.5.6, 1.5.12, and 6.3 of the PWS contemplated that the project management services would be provided on site at the GSA's New Orleans field office by one full-time project manager.  Id. at 9-10, 21.  Section 1.5.12 of the PWS also mandated that an alternate be designated to act in the absence of the project manager.  Id. at 10.  FRS was required to "maintain an adequate workforce for the uninterrupted performance" of its responsibilities.  Id. at 8-9.  A position would be deemed "delinquent" if left unfilled for thirty days.  Id. at 6.  All FRS personnel working under the task order were, pursuant to section 4.2 of the PWS, subject to security screening requirements.  Id. at 14.  Specifically, personnel were required to undergo a National Agency Check with Inquiries ("NACI") or equivalent investigation, which includes a Federal Bureau of Investigation ("FBI") national criminal history (i.e., fingerprint) check.  Id.  The preliminary step of receiving a favorable fingerprint determination was necessary prior to entry on duty.  Id.  Section 1.5.8 of the PWS specified that NACI clearance must be obtained within three months of the task order award and maintained "for the life of the contract."  Id. at 9.

The project manager provided by FRS was required to submit a monthly report to the GSA contracting officer's representative ("COR"), update the project tracking database at least weekly, manage project meetings, develop and maintain project schedules, review and comment on building and system design submissions, prepare draft inspection reports, analyze change orders, draft responses to requests for information, and participate in weekly conference calls to

---

[3] The record before the court does not reflect a reason for the discrepancy among the effective dates, the delivery date, and the period of performance set forth in the task order.

[4] The travel allowance was not included in the $427,123.20 total evaluated price of the award (apparently since travel expenses were paid on a reimbursement basis when incurred), Compl. Ex. at 2, 4-5, 102-04, and is not at issue in this case.

discuss project-related issues.[5]  Id. at 17-18.  Failure to submit a monthly report by the tenth of the month would result in a $500 penalty, and all other failures to meet performance standards could result in the GSA invoking its "contractual remedies."  Id.

On September 24, 2014, Amy Schissel, the project manager at the time, notified FRS's principal, Claude Gregory, of her intention to resign effective October 9, 2014.  Id. at 26; Compl. 1.  Two days later, Joyce Johns, a GSA contract specialist, asked Mr. Gregory about filling the upcoming project manager vacancy and reminded him that the GSA was required to approve the replacement.  Compl. 1; Compl. Ex. 27.  On October 3, 2014, Ms. Johns again asked Mr. Gregory about filling the upcoming vacancy, reiterated the requirement that the GSA approve the replacement, and notified him that the GSA "intend[ed] to exercise the option."[6]  Compl. Ex. 28; accord Compl. 2.

On October 7, 2014, Mr. Gregory forwarded the resume of Isaac Williams to three individuals:  (1) Elizabeth Crawford, the contracting officer, Compl. Ex. 23-24, 33; (2) Norman Bissenden, the COR, id. at 29; Compl. 2; and (3) Ms. Johns.  Compl. 2; Compl. Ex. 29-31.  The next day, Ms. Johns notified Mr. Gregory that the GSA had approved Mr. Williams as project manager.  Compl. 2; Compl. Ex. 32.  The GSA also initiated the background check for Mr. Williams at that time.  Compl. 2; Compl. Ex. 57.  Ms. Schissel completed her last day of work as project manager on October 9, 2014.  Compl. 2.

FRS and the GSA executed a Modification of Contract on November 3, 2014, for the first option year, adding a $12,000 travel allowance and changing the delivery date and period of performance.  Compl. Ex. 24-25, 33-34.  The new delivery date was November 3, 2015, and the new period of performance was November 4, 2014, to November 3, 2015.  Id. at 25, 34.

On December 2, 2014, Mr. Gregory advised Mr. Bissenden that because Mr. Williams's background check remained pending, he was submitting the resume of Debra Lombard as a replacement candidate.  Id. at 35-39, 55, 73; Compl. 2.  Mr. Bissenden then proposed a January 8, 2015 start date for Ms. Lombard.  Compl. Ex. 35, 54, 73.  On December 10, 2014, after Mr. Gregory confirmed Ms. Lombard's availability for the January 8, 2015 start date, the GSA approved her hire.  Id. at 40-41, 52-53, 73; Compl. 2.  Mr. Williams's preliminary background check cleared two days later, on December 12, 2014.  Id. at 42, 57, 73; Compl. 2.

Also on December 10, 2014, Mr. Gregory submitted an invoice to Mr. Bissenden for October 2014.  Compl. 2; Compl. Ex. 41, 52.  Mr. Bissenden replied the same day, asking Mr. Gregory to revise the invoice to reflect that Ms. Schissel was employed as project manager for only nine calendar days.  Compl. Ex. 40, 52-53.  On December 16, 2014, Mr. Gregory sent Mr.

---

[5] Section 6.2 of the PWS contained a deliverables schedule listing reports and other documents to be submitted by the project manager.  Compl. Ex. at 19-20.

[6] The "option" referenced by Ms. Johns apparently was the first option year of the task order.

Bissenden a revised invoice.[7] Id. at 51. The following day, Mr. Gregory and Mr. Bissenden traded a series of electronic-mail messages in which Mr. Bissenden indicated that the GSA would not pay for the entire month of project management services because FRS only provided a project manager through October 9. Id. at 49-51; Compl. 2. In turn, Mr. Gregory stated that the contract was a "firm fixed monthly fee" and "not an hourly rate," emphasizing that the "hours the [project manager] work[s] will vary each month." Compl. Ex. 49-51.

Ms. Lombard began working as project manager on January 12, 2015, her start date having been delayed for a few days due to an illness.[8] Id. at 63, 67-68, 71-72, 116.

On January 27, 2015, Mr. Gregory submitted invoices totaling $26,428.80 to Ms. Johns—$8,809.60 per month for October 2014, November 2014, and December 2014. Id. at 57-58; Compl. 2. These invoices were rejected on February 6, 2015, per Mr. Gregory's direction. Compl. 2; Compl. Ex. 59-66, 75-76. On February 11, 2015, Ms. Crawford contacted Mr. Gregory to summarize her understanding of the issues related to the October 2014, November 2014, and December 2014 invoices. Compl. 2; Compl. Ex. 63.

Meanwhile, on February 10, 2015, Mr. Gregory submitted an invoice for January 2015. Compl. Ex. 68. Mr. Bissenden responded the same day, stating that the GSA could only pay for project management services actually rendered (thus, beginning January 12, 2015) and not for the entire month. Id. at 67-68. Mr. Bissenden followed up two days later. Id. at 67. Mr. Gregory then requested that Ms. Crawford provide the GSA's position in writing. Id. at 70; Compl. 2.

In her February 17, 2015 response, Ms. Crawford reiterated that the GSA could not pay for services not rendered because the contract was "considered a performance based contract and payment [was] based on [FRS's] ability to provide the deliverables." Compl. Ex. 71; see also Federal Acquisition Regulation ("FAR") 37.601(b) (listing required components of performance-based contracts). Ms. Crawford indicated a willingness to reach a "fair and reasonable

---

[7] Also on December 16, 2014, FRS executed a Modification of Contract relating to a different task order (GS-P-07-13-UD-0034) under a separate GSA schedule contract (GS-06F-0022P). Compl. Ex. 43-48. This modification was not addressed by the parties. See, e.g., id. at 97-99 (containing a timeline of events that omits the December 16, 2014 modification). Consequently, it has no bearing on this case and is disregarded by the court.

The court notes that a similar dispute to the one in this case arose under task order GS-P-07-13-UD-0034. FRS sought relief from the Civilian Board of Contract Appeals ("CBCA"), but the CBCA dismissed FRS's complaint under its small claims procedure on August 28, 2016, for failure to state a claim upon which relief could be granted. Fin. & Realty Servs., LLC v. Gen. Servs. Admin., CBCA 5354, 16-1 BCA ¶ 36,472. However, since that dispute relates to a different task order, the CBCA's ruling on that dispute is similarly disregarded by the court.

[8] Ms. Lombard entered duty before her full NACI background check had been completed, but after receiving preliminary approval. Compl. Ex. at 71. Her full background check was not complete until March 11, 2015. Id. at 85-86; Compl. 3. The record before the court does not reflect the precise date when Ms. Lombard received preliminary approval.

-4-

settlement based on the deliverables and services that were provided" for October 2014 and January 2015, and suggested the possibility of either extending the contract to make up for the time when there was no project manager on site or allowing extra hours to be paid for addressing the backlog of work that accrued during that time. Compl. Ex. at 71-72.

Mr. Gregory answered Ms. Crawford the following day, placing responsibility for the absence of a project manager on the slow pace of the government's security screening process. Id. at 73-74. He also observed that FRS had not been notified of any deficiencies, that FAR subpart 37.6 does not contain procedures for reducing the price of a firm-fixed-price task order, and that FRS had not agreed to any modification of the firm-fixed price but nonetheless hoped to reach a solution. Id.

On February 20, 2015, Ms. Crawford formally offered to extend the contract by three months and to pay the January 2015 invoice in full (to represent the partial months of services provided in October 2014 and January 2015) in exchange for FRS agreeing not to invoice for October 2014, November 2014, and December 2014. Id. at 77; Compl. 3. Mr. Gregory rejected the offer on February 24, 2015, insisting on full payment for October 2014 through January 2015 and offering to modify the task order to a labor-hours task order after such payment. Compl. 3; Compl. Ex. 81. That same day, Mr. Gregory also submitted an invoice for January 2015 in the amount of $8,809.60 for the full month of services. Compl. Ex. 82-84.

Ms. Lombard received her final NACI security clearance on March 11, 2015. Id. at 85-86; Compl. 3.

Two days later, the GSA rejected FRS invoices for October 2014, November 2014, December 2014, and January 2015, pending resolution of the dispute. Compl. 3; Compl. Ex. 99.

On March 19, 2015, Mr. Gregory submitted a formal claim to the GSA's contracting officer pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012), and FAR 33.206 for payment of the outstanding invoices for October 2014, November 2014, December 2014, and January 2015. Compl. 3; Compl. Ex. 96-99. The total amount of the claim was $35,238.40 ($8,809.60 for each month). Compl. Ex. 96-97. The claim was based on the contention that the task order was a firm-fixed-price task order, that FRS made good-faith efforts to provide personnel, and that any delay in providing project management services was due to the government security screening process, over which FRS had no control. Id. at 99.

On May 8, 2015, Ms. Crawford issued the contracting officer's final decision pursuant to FAR 33.211, agreeing to pay the January 2015 invoice and rejecting the invoices for October 2014, November 2014, and December 2014.[9] Compl. 3; Compl. Ex. at 115-18. This action

---

[9] Unrelated to the invoice dispute, Ms. Crawford also issued a notice of termination for convenience pursuant to FAR 52.249-1 on May 8, 2015. Compl. 3; Compl. Ex. 119.

followed on December 16, 2015.[10]  Compl. 1.  In its complaint, FRS claims that it is entitled to full payment of its invoices for October 2014, November 2014, and December 2014 because (1) the GSA was not entitled to reject invoices under a firm-fixed-price task order, (2) FRS made a good-faith effort to perform by timely proposing replacement project managers, and (3) the delay in performance was due to the inaction of the government.  Id. at 3-4.  In short, FRS claims that the GSA breached the task order by failing to pay the three invoices.  Id.  Accordingly, FRS seeks the $26,428.80 it claims was due under those invoices.  Id. at 3.  The United States subsequently moved to dismiss the complaint.  The motion is fully briefed, and the court deems oral argument unnecessary.

## II. DISCUSSION

### A. Standard of Review

The United States brings its motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), contending that because FRS is not entitled to payment for services it did not perform regardless of the firm-fixed-price nature of the task order, the complaint fails to state a claim upon which relief can be granted.  To survive such a motion, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face" sufficient for the defendant to have "fair notice" of the claim and the "grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  In ruling on such a motion, the court must "accept as true all of the factual allegations contained in the complaint" and any attachments thereto.  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citing Twombly, 550 U.S. at 555-56); accord RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1342 n.4 (Fed. Cir. 2006) (noting that "materials attached to a complaint may be considered as exhibits that are part of the complaint for determining the sufficiency of the pleadings" under Rule 10(c) of the Federal Rules of Civil Procedure[11]).

---

[10]  Mr. Gregory filed the complaint on FRS's behalf, proceeding pro se.  FRS was substituted as plaintiff after retaining counsel.  Order, Feb. 23, 2016.

[11]  RCFC 10(c) mirrors Rule 10(c) of the Federal Rules of Civil Procedure.

### B. Breach of Contract

The court must determine whether the factual allegations in FRS's complaint are sufficient to state a plausible claim for breach of contract. To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." Century Expl. New Orleans, LLC v. United States, 110 Fed. Cl. 148, 163 (2013) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)). Once a breach of contract is established, the burden shifts to the defendant to plead and prove affirmative defenses that excuse performance. Shell Oil Co. v. United States, 751 F.3d 1282, 1297 (Fed. Cir. 2014) (citing Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1360 (Fed. Cir. 2009)).

Damages are awarded in breach-of-contract cases in an amount "sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); accord Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) ("One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" (quoting Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997))). They are calculated by "perform[ing] the necessary comparison between the breach and non-breach worlds." Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008).

To be recoverable, damages must be "reasonably foreseeable by the breaching party at the time of contracting," the breach must be a substantial cause of the damages, and the damages must be "shown with reasonable certainty." Sys. Fuels, Inc. v. United States, 666 F.3d 1306, 1311 (Fed. Cir. 2012) (quoting Ind. Mich. Power Co., 422 F.3d at 1373 (internal quotation marks omitted)). A party may not recover damages that could have been avoided with reasonable efforts. Ind. Mich. Power Co., 422 F.3d at 1375 (citing Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002)).

### C. FRS Has Pled a Plausible Breach-of-Contract Claim for a Portion of the Time Period at Issue

The issue at this stage of litigation is not the sufficiency of the United States' potential defenses or the likelihood of FRS's eventual success on the merits of its claim, but simply whether FRS has alleged specific facts describing a plausible claim for relief. See Chapman Law Firm Co. v. Greenleaf Const. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) ("The court must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974))).

FRS asserts that the parties entered into a firm-fixed-price task order on September 10, 2013. In other words, it alleges the existence of a valid contract. FRS further contends that the GSA was required, pursuant to the task order, to pay it $8,809.60 each month for October 2014, November 2014, and December 2014, but that it failed to do so. In other words, it alleges the existence of a contractual duty and the GSA's breach of that duty. Finally, FRS states that the

GSA's failure to pay the $26,428.80 due under the invoices deprived it of funds it was owed. In other words, it alleges damages caused by the GSA's breach of contract.

Both the September 10, 2013 task order and the November 3, 2014 modification explicitly reflect that the monthly price of the project management services was $8,809.60. Thus, the GSA was on notice of the exact amount of potential damages for breach of contract arising out of its failure to pay the three invoices at issue.

The United States does not challenge the existence of a valid contract between the GSA and FRS or the foreseeability of damages in the event of its breach, but instead argues that the GSA had no duty to pay FRS for services that were, by FRS's own admission, not rendered. Whether the GSA had such a duty is a matter of contract interpretation. Contract interpretation is a matter of law, and government contracts are no exception. Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1199-1200 (Fed. Cir. 2006). Moreover, interpreting a contract is proper at this stage of the proceedings. See S. Cal. Edison v. United States, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss."), quoted in Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir. 2014); Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment.").

As a general rule, "the government is entitled to strict compliance with contract specifications." TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1342 (Fed. Cir. 2006). The contract at issue is a firm-fixed-price task order, a type of contract that "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." FAR 16.202-1. In other words, the task order price would not be adjusted if FRS's cost to perform the services described in the task order increased or decreased. Id.; see also Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996) ("Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract."). However, notwithstanding the firm-fixed-price nature of the task order, FRS remained obligated to perform. See TEG-Paradigm Envtl., 465 F.3d at 1342 ("[T]he government is entitled to strict compliance with contract specifications."); TPL, Inc. v. United States, 118 Fed. Cl. 434, 436 (2014) (noting that one of the contracts at issue itself stated that "[t]he negotiated firm-fixed price reflects full consideration to the contractor for its performance under the contract"); Agility Def. & Gov't Servs., Inc. v. United States, 115 Fed. Cl. 247, 251 (2014) (noting that the plaintiff's "obligation to perform" under a firm-fixed-price contract "was not the result of the Government's unilateral insistence, but rather the parties' agreement" (emphasis added)); LB&B Assocs. Inc. v. United States, 91 Fed. Cl. 142, 154 (2010) ("A firm-fixed-price contract requires the contractor to perform a task for a set price . . . ." (emphasis added)); cf. Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 (2013) (discussing an agency's use of a price realism analysis to avoid the potential risk of poor performance on a fixed-price contract).

Section 1.5.5 of the PWS required FRS to "at all times maintain an adequate workforce for the uninterrupted performance of all tasks" outlined in the PWS. Further, FRS was required to provide a project manager pursuant to sections 1.5.12 and 6.3 of the PWS, and designate an

alternate who could act in the project manager's absence pursuant to section 1.5.12 of the PWS. In accordance with section 1.5.6 of the PWS, the project manager's work was to be performed on site at the GSA's New Orleans field office.  Section 1.5.8 of the PWS further mandated that all personnel were to meet the security screening requirements (outlined in section 4.2 of the PWS) by December 10, 2013, and thereafter were to "maintain the level of security required for the life of the contract."[12]

In spite of these requirements, FRS provided neither a project manager nor an alternate who met the security screening requirements from October 10, 2014, to January 11, 2015.  FRS's failure to provide such personnel necessarily meant that it failed to provide the contracted-for project management services.  See, e.g., Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 193 (2013) ("A contract is breached when a party fails to perform a contractual duty when it is due.  Non-performance includes defective performance as well as an absence of performance." (citations and internal quotation marks omitted)).  Consequently, the GSA was not obligated to pay the invoices for the disputed time periods because there is no duty to pay when the obligor fails to perform.  See Laguna Constr. Co., Inc. v. Carter, 828 F.3d 1364, 1372-73 (Fed. Cir. 2016) (noting that the contractor's prior material breach excused the government's nonperformance); United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed. Cir. 1986) ("[I]t is only fair and just that the Government pay for goods delivered or services rendered and accepted under it."); FAR 32.904(b)(1)(ii) (setting the payment due date in reference to services performed).

However, the inquiry does not end there.  Both parties have an "implied duty of good faith and fair dealing," i.e., the duty "not to hinder and . . . to cooperate."  Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 827 (Fed. Cir. 2010); accord Universal Constr., Inc. v. United States, 71 Fed. Cl. 179, 187 (2006) ("The government has an implied obligation to refrain from hindering or delaying the performance of a contractor, and must do whatever is necessary to enable the contractor to perform.").  In other words, a party to a contract may not "interfere with another party's rights under the contract."  Gulf Grp. Gen. Enters. Co. W.L.L. v. United States, 114 Fed. Cl. 258, 397 (2013) (citing Restatement (Second) of Contracts § 205 cmt. d).

Government contracts typically include a "delay" clause setting forth specific requirements when a government-caused delay is alleged, but in this case, neither the entire contract nor any reference to such a clause is before the court.  Nevertheless, "[t]here are three potential causes of delay in performance of a contract:  the contractor's actions, the government's actions, and forces outside the control of both parties."  England v. Sherman R. Smoot Corp., 388 F.3d 844, 857 (Fed. Cir. 2004).  A contractor's delay in performance must not result from the contractor's actions to be excusable.  See, e.g., P.R. Burke Corp. v. United States, 277 F.3d 1346, 1359-60 (Fed. Cir. 2002) (explaining that the plaintiff must "establish that the government alone delayed the work" in order to recover); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 238 (2005) (explaining that government-caused delays "will not be

---

[12] Although the December 10, 2013 date was not explicitly stated in the PWS, section 1.5.8 mandated that security screening requirements be completed within three months of the task order award, which occurred on September 10, 2013.

compensable if the contractor, or some other factor not chargeable to the government, has caused a delay concurrent with the government-caused delay"). Furthermore, recovery is limited to "unnecessary or unreasonable" delays. P.R. Burke Corp., 277 F.3d at 1360; see also id. (distinguishing between delays caused by the government and those incurred as a result of the government's contractual right); Redland Co. v. United States, 97 Fed. Cl. 736, 754 (2011) ("When the government does delay a contractor's performance, however, liability attaches only when the actions causing the delay are unreasonable.").

According to FRS, any nonperformance on its part that would otherwise excuse payment by the GSA was the result of government actions that interfered with its ability to perform under the task order. This delay argument is the thrust of FRS's claim. FRS alleged that it was not able to provide project management services during October 2014, November 2014, and December 2014 due to the delay caused by the government security screening process, over which it had no control,[13] and that it met its implied duty of good faith and fair dealing by taking "immediate steps" to fill the project manager position pursuant to Section 4.1 of the PWS by nominating replacement candidates in a timely fashion. FRS further asserts that the GSA did not issue any delinquency or cure notices and did not assert any claims against FRS for inexcusable delay or default, and that it could have performed the work without having cleared personnel. Essentially, FRS attributes the delay in performance—i.e., the lack of a project manager performing services on site during October 2014, November 2014, and December 2014—solely to the government. The United States, on the other hand, attributes the delay to FRS's failure to have in place qualified personnel at all times, as specified in sections 1.5.5, 1.5.8, 1.5.12, 4.1, 4.2, and 6.3 of the PWS.

A plain reading of the task order, which is governed by the PWS, supports the United States' position. FRS was required to maintain personnel for the continuous, uninterrupted performance of project management services at the GSA's New Orleans field office, and it failed to do so. The project manager vacancy did not occur until over a year after the effective date of the task order, during which time FRS was aware of the security screening requirements. In addition, FRS has never alleged that it attempted to comply with section 1.5.12 of the PWS—which requires that it have an alternate in place—beyond proposing a replacement two days in advance of the vacancy. Furthermore, FRS's arguments regarding the lack of delinquency or cure notices and the absence of claims for inexcusable delay or fault are without merit. The GSA reminded FRS multiple times (in writing) about the need to fill the project manager position, and there were several occasions on which the GSA stated (also in writing) that it could not pay for services not rendered, the initial such occasion being the same day that FRS first attempted to invoice for nonperformance. FRS's argument that it could have performed the work without having cleared personnel is similarly meritless because it directly contradicts the contractual requirement that the work be performed on site at the GSA's New Orleans field office (under

---

[13] The preliminary portion of the screening process took sixty-five days (from October 8, 2014, to December 12, 2014) for Mr. Williams. Although the record before the court does not reflect when Ms. Lombard received preliminary approval, her preliminary screening process necessarily took thirty-three days or less (from her GSA hiring approval on December 10, 2014, to her entry on duty on January 12, 2015), and her entire NACI screening process took ninety-one days (from December 10, 2014, to March 11, 2015).

section 1.5.6 of the PWS), and that personnel must be cleared to access federal buildings (under section 4.2 of the PWS).

In short, FRS could have avoided any delay in performance simply by meeting its own contractual obligations. Therefore, any government-caused delay in FRS's performance cannot be excused. See P.R. Burke Corp., 277 F.3d at 1359-60. Since there was no excuse for the delay in performance, FRS has failed to allege facts plausibly demonstrating that the GSA had a duty to pay for the period of nonperformance.

FRS also contends, in a footnote in its opposition to the United States' motion to dismiss, that the GSA waived FRS's noncompliance for the months at issue by not issuing any cure notices or assessing a contractual penalty, initiating the security screening process on project manager candidates, and subsequently accepting and paying for project management services after the time period in question. The court need not consider arguments advanced in footnotes. See, e.g., SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived. . . . Further, arguments raised in footnotes are not preserved."). However, even if the court were, in an exercise of its discretion, to consider FRS's waiver argument, it would find the argument to be without merit because (1) the GSA notified FRS multiple times of the need to fill the project manager position since an uninterrupted workflow was essential, (2) not paying for services that were never rendered is a "contractual remedy" contemplated by the PWS that the GSA invoked, (3) the GSA could not have waived a defense against an obligation that never arose, and (4) the GSA's acceptance of and payment for services in subsequent months was unrelated to the months at issue because each month stands on its own. Moreover, FRS failed to reference any contractual provisions dealing with government wrongdoing (such as a "delay" clause) and any steps it took to address the GSA's alleged inaction beyond merely naming a replacement candidate for the project manager position. Thus, the GSA cannot plausibly be deemed to have waived FRS's noncompliance with the task order's requirements.

For its part, FRS has alleged that there was a valid contract between the parties, that the GSA had a duty to pay because services were provided under the firm-fixed-price task order, that the GSA breached that duty by failing to pay, that FRS suffered damages as a result of the GSA's breach, and that the amount of potential damages was known to an exact certainty by the GSA prior to the breach. However, the GSA's duty to pay is limited, as a matter of law, to the period in which FRS actually performed its obligations under the task order because the facts pled by FRS do not plausibly excuse its nonperformance. See Iqbal, 556 U.S. at 679 ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2)).

In short, FRS has established a prima facie breach-of-contract claim for the time period of October 1, 2014, through October 9, 2014, but has failed to establish a prima facie breach-of-contract claim for the time period of October 10, 2014, through December 31, 2014. The court must therefore deny in part—with respect to October 1, 2014, through October 9, 2014—and grant in part—with respect to October 10, 2014, through December 31, 2014—the United States' motion to dismiss.

### III.  CONCLUSION

For the foregoing reasons, the court **DENIES IN PART** and **GRANTS IN PART** the United States' motion to dismiss.  The United States is directed to file its answer pursuant to RCFC 12(a)(4)(A).

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney  
MARGARET M. SWEENEY  
Judge